[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 835 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 836 
¶ 1. Deborah D. Barnett (Debbie) appeals the decision of the Chancery Court of Madison County regarding classification and distribution of certain assets and liabilities and the amount awarded her in permanent periodic and lump sum alimony, child support and attorney's fees. Houston B. Barnett, Jr. (Bard) cross-appeals challenging the court's classification of one asset and the amount awarded Debbie in permanent periodic and lump sum alimony and attorney's fees. Finding that the chancellor erred only in the classification of one asset, the Scudder Investment account, we affirm in part and reverse and remand in part.
 STATEMENT OF FACTS AND DISPOSITION ¶ 2. Debbie and Bard were married on October 11, 1989, and separated on or about June 25, 2001. An agreed temporary *Page 837 
order was filed on July 25, 2001, and the case for divorce was tried on January 7, 2003. Bard admitted to adulterous conduct which commenced following separation of the parties; based on this evidence, the lower court granted Debbie a divorce on the ground of uncondoned adultery.
 ¶ 3. A hearing as to the classification and disposition of property, alimony and child support was held on January 13, 2003. The court's amended final judgment and twenty-two page amended opinion were filed on June 16, 2003. In accordance with Hemsleyv. Hemsley, 639 So.2d 909, 914-15 (Miss. 1994), the court determined which assets were subject to equitable division and concluded that marital assets totaled $174,691.20. After engaging in an item-by-item analysis of the factors established inFerguson v. Ferguson, 639 So.2d 921 (Miss. 1994), the chancellor determined that the parties were entitled to an equal division of the marital assets. Each party was to receive fifty percent of the net equity in the marital estate. Debbie was awarded the marital home as part of her share but was ordered to refinance the home in her own name and to make all mortgage payments.
 ¶ 4. In determining whether alimony was appropriate for Debbie, the court considered the factors articulated by the supreme court in Armstrong v. Armstrong, 618 So.2d 1278 (Miss. 1993) and ordered Bard to pay Debbie $400 per month in rehabilitative alimony, commencing on April 1, 2003, and continuing until August 19, 2007, $600 per month in permanent periodic alimony to commence on April 1, 2003, and lump sum alimony of $5,000 by noon August 1, 2003.
 ¶ 5. Bard was also ordered to pay Debbie $750 per month as child support for the couple's two minor children, to carry a $100,000 term life insurance policy with the children as primary beneficiaries until August 19, 2015, to provide health, hospitalization, vision, and dental insurance for the children with Bard being responsible for the co-pay on this insurance, to be responsible for sixty percent of all uninsured medical, dental, doctor, orthodontic, optical, psychological, and/or prescription drug expenses, and to pay one-half of one extracurricular activity for each child not to exceed $240 a year per child. The issue of college education expenses was to be revisited at a later time should the children demonstrate an aptitude for at college. The court ordered that Bard would be allowed to claim the two children on his tax return.
 ¶ 6. The chancellor further ordered Bard to pay one half of Debbie's attorney's fees, which half totaled $18,709.95.
 ¶ 7. Debbie appealed challenging the chancellor's determinations as to whether certain assets were non-marital property, as to her being wholly responsible for the mortgage on the marital home, and as to the amounts awarded for permanent periodic and lump sum alimony, child support and attorney's fees. Bard cross-appealed challenging the determination as to whether one asset was marital property and the amounts awarded for permanent periodic alimony, lump sum alimony and attorney's fees. Finding that the chancellor erred only in the classification of one asset, the Scudder Investment account, we affirm in part and reverse and remand in part.
 STANDARD OF REVIEW ¶ 8. "Absent manifest error, this Court will not reverse a chancellor's findings in a case of domestic relations." Davis v.Davis, 638 So.2d 1288, 1293 (Miss. 1994). An appellate court may reverse a chancellor's findings of fact only when there is not "substantial, credible evidence" justifying his finding. SnowLake Shores Property Owners Corp. v. Smith, *Page 838 610 So.2d 357, 360 (Miss. 1992). The chancellor's findings will not be disturbed "unless the Chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied."Bell v. Parker, 563 So.2d 594, 596-97 (Miss. 1990).
 ISSUES AND ANALYSIS I. WHETHER THE TRIAL COURT COMMITTED MANIFEST ERROR IN THE CLASSIFICATION AND DISTRIBUTION OF THE PARTIES' ASSETS AND LIABILITIES.
A. CLASSIFICATION
 ¶ 9. In dividing property of a couple upon divorce, the chancellor must first classify their assets and liabilities as marital or non-marital pursuant to Hemsley. Smith v. Smith,856 So.2d 717, 719 (¶ 8) (Miss.Ct.App. 2003). For purposes of divorce, the supreme court has defined marital property as "any and all property acquired or accumulated during the marriage." Hemsley,639 So.2d at 915. Thus, it follows that non-marital property is that which is acquired before or outside the marriage and is therefore not subject to equitable division. Hankins v.Hankins, 866 So.2d 508, 511 (¶ 13) (Miss.Ct.App. 2004). Once this classification is accomplished, "the marital property is then equitably divided, employing the Ferguson factors as guidelines, in light of each parties' non-marital property."Johnson v. Johnson, 650 So.2d 1281, 1287 (Miss. 1994), citingFerguson, 639 So.2d at 928. It must be kept in mind as we discuss classification and distribution of the assets and liabilities that "equitable division of [marital] property does not always mean an equal division of property." Bresnahan v.Bresnahan, 818 So.2d 1113, 1118 (¶ 11) (Miss. 2002). Equitable division is "committed to the discretion and conscience of the Court, having in mind all of the equities and other relevant facts and circumstances." Brown v. Brown, 574 So.2d 688, 691
(Miss. 1990). As long as the chancellor utilized the proper legal standard, we will not re-weigh the evidence or disturb his findings on appeal absent manifest error. See Daniel v. Daniel,770 So.2d 562, 567 (¶ 14) (Miss.Ct.App. 2000) (citing Smith v.Jones, 654 So.2d 480, 485 (Miss. 1995)).
 ¶ 10. Debbie contends that the chancellor committed manifest error in classifying certain assets as non-marital. Specifically, she claims that the court erred in finding that $18,748.11 of a Raymond James IRA constituted non-marital property as contributed by Bard prior to the marriage; further, she contends that the chancellor erred in labeling a Scudder Investments account in the amount of $2,155.19 as a non-marital asset. Bard, on the other hand, contends that the chancellor erred in classifying a certain Raymond James investment account in the amount of $2,502.98 as a marital asset. We address each of these issues in turn.
 ¶ 11. Bard testified that prior to the marriage he had made contributions to the Raymond James IRA in the amount of $18,583 from his employment at Roadway Services. Debbie offered no contradictory evidence but called Bard as an adverse witness and questioned him regarding his calculations, which were made in handwriting on a letter from an analyst with Fed Corporation's retirement and saving plans.[1] When Bard's counsel subsequently *Page 839 
attempted to introduce the letter which had been tendered to the court during Bard's testimony as an adverse witness, counsel for Debbie objected based on hearsay. The court admitted the letter into evidence over the objection because the document had all "indicia of credibility" and it was "the only thing we have got." The chancellor found the $18,748.11 accumulated prior to the marriage to be non-marital property; the remainder of the Raymond James IRA account, $68,248.94, was determined to be marital property for purposes of the property division. Debbie's sole challenge to the chancellor's determination is introduction of the letter over her objection.
 ¶ 12. We review the introduction of evidence under an abuse of discretion standard. Hall v. State, 785 So.2d 302, 304 (¶ 6) (Miss.Ct.App. 2001). We find that the chancellor was within his discretion when he admitted the letter into evidence. Based on the ruling of the chancellor, the letter was properly admitted under Rule 803(24) of the Mississippi Rules of Evidence, which authorizes introduction of:
 A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.
The statement was offered as evidence of a material fact, and the chancellor determined that the letter had indicia of credibility and that there was no other evidence on this point. We find that the chancellor acted within his discretion in admitting the letter into evidence over Debbie's objection. Moreover, as noted by Bard, Debbie elicited the same information contained in the letter during her examination of him as an adverse witness. Even without the actual introduction of the letter by Bard's counsel, his testimony regarding the contributions to the account prior to marriage would be sufficient to affirm the chancellor's determination as to the value of the non-marital portion of the IRA account.
 ¶ 13. As to the Scudder Investments account, containing $2,155.19, both parties agreed at the January 13, 2003 hearing that the account was acquired with marital assets as a college education fund for the children. In his original opinion, however, the chancellor labeled the account as "non-marital," the same as he did two other accounts which the parties agreed were to be used for the benefit of the children. On motion for reconsideration, Debbie recited that the parties "stipulated, prior to trial, that this account would be considered anon-marital asset based solely on the fact the funds were placed into the account by [Bard] during the course of the marriage to defray the minor children's college education expenses." (Emphasis added). As the account was under the control of Bard, Debbie urged the court to restrict the account for college educational use and to add her name to the account for the purpose that she would be part of any transaction concerning the account. *Page 840 
While the chancellor recognized the verbal agreement of the parties that the funds would be used to pay for the children's college education, he declined to order Bard to spend the funds only for that purpose. Quoting Kirkland v. McGraw,806 So.2d 1180, 1184 (¶ 8) (Miss.Ct.App. 2002), the chancellor held that a college education "must be earned by children through respect for their parents, love, affection, and appreciation of parental efforts" and that any issue of college expenses was premature.
 ¶ 14. On appeal, Debbie argues that the account should have been classified as a marital asset, but if it is a non-marital asset, the account should not be awarded to either party as part of his/her separate estate but should be reserved for educational expenses of the children. Bard agrees that the account was acquired with marital funds, should not be awarded to either party as part of his/her separate estate and be reserved for the children's college expenses. He represents that it was his understanding from the hearing that the account would remain an undivided marital asset that actually belongs to the children. Based upon the record of the hearing and the admissions of the parties before this Court, we find that the chancery court erred in not classifying the account as a marital asset and ordering the fund to be reserved for college expenses of the children. While it is true that neither child may attend college, the parties set aside the account for that purpose with the use of marital assets; accordingly, it would be inappropriate for Bard to have unfettered control over the account. We reverse and remand to the chancery court to classify the Scudder Investment account as a marital asset to be reserved for the benefit of the children's college expenses; in the event neither child attends college, and the parties are unable to agree as to the distribution of the account, they may apply to the court for further instruction.
 ¶ 15. On cross-appeal Bard asserts that the chancellor committed abuse of discretion in classifying a certain Raymond James investment account, in the amount of $2,502.98, as a marital asset and in considering it in the equitable distribution of property. Bard testified that he closed his mother's investment account with Prudential in the amount of $4,736.39 and opened the Raymond James account the next day for the same amount in his name. He stated that while the money belonged to his mother, the account was in his name "to get it out of my mother's name . . . because she had no money and we were considering trying to get her on medicaid."[2] On cross examination, however, Bard admitted that he co-mingled the money from "his mother's" account with his own. He further acknowledged that, unknown to Debbie, for several years during the marriage, he sent his mother $100 per month out of marital assets. The person claiming that an asset is non-marital has the burden of demonstrating the assets to be non-marital. A L, Inc. v.Grantham, 747 So.2d 832, 839 (¶ 23) (Miss. 1999). We find that the chancellor did not abuse his discretion in finding that the Raymond James account was a marital asset since Bard's name was the only name on the account, the statement was mailed to his post office box, and he admitted to *Page 841 
co-mingling the assets with his own during the marriage. In addition, Bard routinely sent his mother money for support from marital assets; therefore, it was not inequitable to find that the account in question was a marital asset.
 ¶ 16. As to liabilities, Debbie asserts that the chancellor committed manifest error in his determination that certain debts were marital liabilities because they were incurred after the parties separated on June 25, 2001. Specifically, Debbie complains of the classification of a BankPlus loan in the amount of $7,911.30 which Bard used to purchase a Dodge Ram truck and the Trustmark loan in the amount of $2,032.11 which Bard used to purchase furniture for his apartment. The chancellor classified both the truck and its debt as marital and assigned them to Bard. As to the furniture, the record reflects that Debbie retained the vast majority of the couple's furniture with the marital residence; upon separation, Bard was required to purchase certain furniture for his apartment. The record does not reflect that Debbie sought to have the furniture classified as marital property; accordingly, only the debt was presented to the chancellor for decision. The chancellor determined the debt to be marital and assigned it to Bard.
 ¶ 17. Citing Aron v. Aron, 832 So.2d 1257, 1259 (¶ 8) (Miss.Ct.App. 2002), Debbie recognizes that the "chancellor has discretion in determining whether acquisitions made in a marriage's dying stages qualify as marital or separate property." She argues, however, that the chancellor abused his discretion in finding the debts to be marital liabilities as she was not consulted prior to their creation. First, the record reflects that during the course of the marriage, Bard controlled the family finances and made a number of expenditures of which Debbie was unaware; in turn, Debbie obtained employment of which Bard was unaware and did not account to him for her income or expenditures. Clearly, consultation has never been a prerequisite for expenditure of marital assets by the parties. Second, inAron, we concluded that "the entry of a separate maintenance order may be a line of demarcation for classifying property as marital or separate." Id. at (¶ 7), citing Godwin v. Godwin,758 So.2d 384, 386 (¶ 6) (Miss. 1999). This "line of demarcation" was extended to the entry of an order for temporary support inPittman v. Pittman, 791 So.2d 857, 864 (¶¶ 17-18) (Miss.Ct.App. 2001). In the instant case, the BankPlus loan on the truck was made on June 8, 2001, before the separation of the parties and before entry of the temporary order on July 25, 2001; accordingly, Aron does not support Debbie's contention regarding the BankPlus loan. The record does not reflect whether the furniture loan was made prior to or after the temporary order; therefore, we cannot determine whether the "line of demarcation" was crossed. Accordingly, we will revert to the "abuse of discretion" standard to determine whether the chancellor erred in classifying the debt as marital. Debbie retained the vast majority of the couple's furniture and has not argued that Bard was unreasonable in purchasing furniture for his separate residence. The chancellor classified the debt as marital but assigned it to Bard as his responsibility. We cannot say, under the circumstances of this case, that he abused his discretion in this regard.
 ¶ 18. In summary, upon a thorough review of the record and the arguments of the parties, we conclude that the chancellor erred only in his classification of the Scudder Investments account and reverse and remand only as to the classification of that account.
 B. DISTRIBUTION *Page 842 
 ¶ 19. Once the property has been properly classified as marital or non-marital, the marital property is then equitably divided.See, e.g., Johnson, 650 So.2d at 1281. Mississippi has long recognized the chancery court has the authority during divorce proceedings to order an equitable division of property "accumulated through the joint contributions and efforts of the party." Ferguson v. Ferguson, 639 So.2d at 934 (quotingBrown, 574 So.2d at 690). The contributions can be in both the form of "actual money earned and terms of service without compensation, i.e., domestic duties." Hensarling v. Hensarling,824 So.2d 583, 591 (¶ 22) (Miss. 2002). In his opinion, the chancellor fully considered the Ferguson factors; he reviewed the financial and domestic contributions of each party and determined that Debbie and Bard were entitled to equal division of the marital assets.
 ¶ 20. While each party agrees with most of the chancellor's findings under each of the guidelines, Debbie challenges the factual findings of the court as to a number of the Ferguson
factors, mainly alleging that Bard hid an $11,000 annuity and $10,000 in cash from her, Bard expended marital assets on his paramour prior to the divorce, and the court was arbitrary and capricious in determining her earning capacity. This Court cannot find the chancellor abused his discretion concerning any of these matters.
 ¶ 21. Bard did not disclose the annuity and cash until one month before trial and admitted that he was not justified in doing so, but explained that he had saved the cash for his mother's funeral expenses and the annuity for Brandon's future medical needs. The chancellor was made aware that these amounts were not initially disclosed and included them in calculating the marital assets; we cannot find that the chancellor erred in failing to take punitive action against Bard under the circumstances in this case. Regarding Debbie's claim that Bard expended marital assets on his paramour prior to the divorce, there is no question that Bard spent some money on his girlfriend after the separation and prior to the final divorce, but as the chancellor noted, he was not "presented with any documentary evidence such as receipts or credit card statements proving such expenditures or indicating what monies paid for these outings." The chancellor also noted that testimony indicated that Bard may have used his expense account as a source of funds. The chancellor considered the evidence and did not find the proof sufficient to show Bard wasted marital assets. With respect to Debbie's contention that the court's factual determination as to her earning capacity was arbitrary and capricious, this Court cannot find that the chancellor's determination that Debbie could earn at least $1,200 per month is not based on substantial evidence. The chancellor found that Debbie previously made $1,200 per month before quitting her full-time employment with State Farm, sometime around 1991, to care for the needs of her family. At the time of the hearing, Debbie was earning approximately $700 per month from part-time employment. We do not find that the chancellor erred in determining that Debbie could reasonably earn $1,200 per month.
 ¶ 22. Having found that the chancellor did not abuse his discretion in application of the Ferguson factors, we now address Debbie's contentions of inequitable division of marital property. While she agrees that the parties correctly received an "equal" share of the marital assets, Debbie contends that there was an inequitable division in that she received an overwhelming majority of the marital debt and almost none of the liquid marital assets. *Page 843 
We do not find that the chancellor abused his discretion in distributing the marital property in this manner. Each party received $87,345.60 in marital assets. Bard was left with $11,543.41 in marital liability, and Debbie was left with $76,696.05 in marital liability, $76,396.05 of which was for the mortgage on the marital home.[3] Debbie correctly points out that this is a $65,152.64 difference in debt; however, she fails to mention that the chancellor considered this discrepancy by noting that the debt on the marital home was more than covered by the value of the home. The chancellor made a similar observation when assigning to Bard the $7,911.30 liability for the BankPlus loan on his truck, since the truck was worth more than the loan. As these two liabilities were more than covered by the value of the associated assets, we find no discrepancy in the marital liabilities; the parties were awarded assets sufficient to cover their indebtedness. With these two liabilities omitted, Bard was left with $3,632.11 in marital liability, and Debbie was left with $300 in marital liability. Addressing Debbie's complaint of not being awarded any liquid assets on motion for reconsideration, the chancellor awarded her $5,000 in lump sum alimony, which, in this case, constitutes a considerable liquid asset.
 ¶ 23. With the exception of the classification of the Scudder Investment Account, we affirm the chancellor's classification and distribution of the marital property.
 II. WHETHER THE CHANCELLOR COMMITTED MANIFEST ERROR IN THE AMOUNT OF PERIODIC ALIMONY AND LUMP SUM ALIMONY AWARDED DEBBIE.
 ¶ 24. After the equitable division of marital property and considering the non-marital assets of each spouse, if one party is left with a deficit, alimony based on the value of non-marital assets should be considered. Johnson v. Johnson,650 So.2d 1281, 1287 (Miss. 1994). The Mississippi Supreme Court has held "alimony, if allowed, should be reasonable in amount commensurate with the wife's accustomed standard of living, minus her own resources, and considering the ability of the husband to pay."Gray v. Gray, 562 So.2d 79, 83 (Miss. 1990). "As long as the chancellor follows this general standard, the amount of the award is largely within his discretion." Id. (citing Wood v. Wood,495 So.2d 503, 506 (Miss. 1986)).
 ¶ 25. In the instant case, the chancellor found that "[t]he division of property will not remove the need for periodic payments to Debbie," and determined the award of alimony by considering the factors identified by the Mississippi Supreme Court in Armstrong, 618 So.2d at 1280.[4] Debbie *Page 844 
argues that the amount of periodic alimony is inadequate; on cross-appeal, Bard contends that the chancellor erred in awarding permanent periodic alimony or, in the alternative, that the alimony awarded was excessive. The chancellor made specific findings of fact that Bard makes in excess of $90,000 per year while Debbie could potentially make $14,400 per year. Based on the standards for awarding alimony, the chancellor attempted to allow Debbie the same or similar standard of living to which she became accustomed considering her own resources and Bard's ability to pay. From the record, we do not see that the chancellor abused his discretion or that the alimony award was either inadequate or excessive.
 ¶ 26. Debbie argues that the chancellor erred in finding that the discrepancy between Bard's income and Debbie's will be offset by Bard's additional expenses of child support, health insurance, and alimony. We find no error. As to his ability to pay, the latest financial statement, submitted by Bard pursuant to Rule 8.05 of the Uniform Chancery Court Rules, stated his monthly expenses to be $3,752, which the chancellor found to be reasonable. Based on Bard's Rule 8.05 statement, the chancellor determined Bard's monthly pay to be $5,545,[5] not allowing deductions for health insurance and retirement. The difference between Bard's income and monthly expenses left an amount totaling $1,793. Bard was ordered to pay $1,750 per month to Debbie in the form of alimony and child support. This amount does not include the children's health insurance and other expenses of the children for which Bard was also required to pay. The chancellor accounted for practically every dollar that Bard had available each month over his reasonable living expenses, and we find no abuse of discretion.
 ¶ 27. Debbie argues that the $5,000 in lump sum alimony is so inadequate as to be arbitrary and capricious, and, on cross-appeal, Bard contends that the chancellor was in manifest error or abused his discretion in awarding Debbie any lump sum alimony. We find no error in the $5,000 award of lump sum alimony. In the chancellor's amended opinion he stated, "[T]he Court having failed to consider Bard's expense account through his employment finds that Bard shall pay Debbie lump sum alimony in the sum of $5,000. . . ." In deciding to award lump sum alimony, the chancellor noted that he forgot the expense account[6] as a potential source of income that could affect Bard's ability to pay, and noted that Debbie's lease on her vehicle was about to expire with an option to purchase the $20,000 vehicle. It is clear from the record that the chancellor properly considered Debbie's *Page 845 
resources or lack thereof, and decided that she was entitled to an award of lump sum alimony; the court awarded an amount equal to approximately one-half of Bard's 2002 expense account. Bard argues that he does not consider the expense account as income, and that it was primarily used for business expenses. We do not find that the court erred in determining this account to be an additional source of income for the payment of lump sum alimony. Further, while the court referred to the expense account, Bard had other separate estate sufficient to satisfy the lump sum alimony obligation. We do not find that the chancellor abused his discretion in awarding Debbie $5,000 in lump sum alimony.
 ¶ 28. We affirm the chancellor's determination as to the amounts of periodic and lump sum alimony and reject the appeal and cross-appeal on this issue.
 III. WHETHER THE CHANCELLOR COMMITTED MANIFEST ERROR IN AWARDING ONLY SEVEN HUNDRED AND FIFTY DOLLARS PER MONTH IN CHILD SUPPORT.
 ¶ 29. Debbie recognizes that, since Bard's adjusted gross income exceeded $50,000, the Mississippi child support guidelines contained in Mississippi Code Annotated Section 43-19-101 (Rev. 2004) do not apply unless the Court determines that an application of the guidelines is reasonable. Debbie argues, however, that the chancellor did not make written findings as to whether or not he applied the child support guidelines. She asks that we remand for this purpose, and if on remand the child support guidelines do apply, then Bard be required to pay twenty percent of his adjusted gross income, or $1,109 per month, or if the guidelines do not apply, then Bard pay child support of $1,073.11 which is allegedly the children's monthly expenses. We deny Debbie's requests and reject her arguments.
 ¶ 30. Debbie argues that while the chancellor analyzed the facts of the case pursuant to the criteria set forth in § 43-19-101, he did not make a written finding that the application of the guidelines was reasonable. Debbie states that "the Trial Court gave no explanation for its deviation or why it considered $750 per month as Bard's child support obligation." Debbie further argues that if the trial court determined that the child support guidelines did not apply, the trial court should have accepted Debbie's testimony as to the reasonable needs of the minor children. Debbie states that she testified that a reasonable estimate of the children's monthly living expenses was $1,073.11 per month, and that the trial court agreed these expenses were reasonable.[7]
 ¶ 31. This Court has held that "the guidelines are just that — guidance. The chancellor is not to follow them mechanically. However, it is important for the guidelines to shape a decision, as they allow the needs of a child and financial ability of a parent to be blended." Kilgore v. Fuller, 741 So.2d 351, 354 (¶ 10) (Miss.Ct.App. 1999). In other words, the guidelines must serve as a reference if the chancellor decides to variate from them. Kilgore, 741 So.2d at 358 (¶ 27). In the instant case, we find that the court properly utilized the *Page 846 
guidelines to shape his decision as to the amount of child support. The chancellor initially recognized that "Bard's adjusted gross income . . . exceeds $50,000; therefore, the Mississippi child support guidelines do not apply unless the Court determines an application of the guidelines is reasonable." He further recognized that twenty percent of Bard's net monthly pay, the percentage specified for two children under Mississippi Code Annotated § 43-19-101(1) (Rev. 2004), would be $1,109 per month. However, the chancellor then considered that Bard would be providing $170 per month in "health, hospitalization, vision and dental insurance coverage" for the two children and sixty percent of all uninsured costs.[8]
 ¶ 32. After such consideration the court determined that Bard should pay $750 per month as child support; additionally, the court ordered Bard to pay one-half of one extracurricular activity for each child not to exceed $240 a year per child. This Court has held "that health . . . expenses are not included in determining the amount of the support under the guidelines though such extra obligations could well be considered for a downward departure from the guidelines under section 43-19-103."Kilgore, 741 So.2d at 356 (¶ 16). It is clear the chancellor analyzed this case with reference to the child support guidelines and determined that, based upon Bard's other obligations, $750 was appropriate child support to be paid to Debbie. We find that the chancellor consulted the guidelines, determined that application was not reasonable, and allowed a downward deviation based on Bard's required payment of other expenses. This Court cannot find that the chancellor committed manifest error in his calculation of child support.
 IV. WHETHER THE TRIAL COURT COMMITTED MANIFEST ERROR IN NOT ORDERING BARD TO PAY ONE-HALF OF THE CHILDREN'S PUBLIC SCHOOL COSTS AND COLLEGE EDUCATION EXPENSES.
 ¶ 33. Debbie argues that the trial court committed manifest error by failing to require Bard to pay one-half of the children's public school costs and college expenses. We reject these arguments. Concerning the public school expenses, Debbie requested that Bard be made to pay three quarters of all public education costs until each child obtains a high school diploma. The chancellor did not address this issue in his initial opinion, and Debbie failed to bring this issue before the chancellor's attention for his consideration in her motion to alter or amend final judgment. It is the duty of the appellant to secure a ruling on all issues or they are thereby waived. Minor v.State, 396 So.2d 1031, 1033 (Miss. 1981). Since Debbie failed to obtain the chancellor's ruling on this issue, it was not properly preserved for appeal.
 ¶ 34. Concerning college expenses, the chancellor correctly relied on Mississippi case law:
 [T]he child must maintain a healthy and caring relationship with the father, as well as exhibit the necessary aptitude to exceed at college, before the court will require the father to pay college expenses. [A college education] cannot ordinarily be demanded, but must be earned by children through respect for *Page 847 
their parents, love, affection, and appreciation of parental efforts.
Kirkland v. McGraw, 806 So.2d 1180, 1184 (¶ 8) (Miss.Ct.App. 2002). The chancellor held that the issue of college educational needs could be revisited should the children demonstrate an aptitude for college. We do not find that the chancellor was in error for not ordering Bard to pay one-half of college expenses.
 V. WHETHER THE TRIAL COURT COMMITTED MANIFEST ERROR IN RULING BARD SHOULD BE ALLOWED TO CLAIM THE PARTIES' TWO CHILDREN AS EXEMPTIONS ON HIS TAX RETURNS.
 ¶ 35. Debbie argues that the chancellor was in error for allowing Bard to claim the two children on his tax return, alleging that, "this holding was not supported by evidence or finding of facts but rather the Trial Court's belief that Debbie will `likely' receive a refund check and will be eligible for an Earned Income Tax Credit." The chancellor stated that he considered that, at Debbie's current alimony level, she would likely receive a refund check. The chancellor further stated that since Debbie has physical custody of the children she would qualify for head of household treatment and for Earned Income Tax Credit. Admittedly, this Court is without sufficient evidence to determine whether Debbie will qualify for an Earned Income Tax Credit; however, we cannot find that the chancellor committed manifest error in comparing the relative tax liabilities of the parties and awarding Bard the right to claim the parties' two children on his tax return. Debbie submitted no evidence of her anticipated tax liability for the chancellor's consideration. "There is nothing, however, which prohibits [Debbie] from petitioning for modification of this award should she become gainfully employed and have her household situated so that an evaluation can be made by the Chancellor to allocate the exemptions." See Louk v. Louk, 761 So.2d 878, 884 (¶ 19) (Miss. 2000).
 VI. WHETHER THE TRIAL COURT COMMITTED MANIFEST ERROR IN FAILING TO ORDER BARD TO PAY ALL OF DEBBIE'S REASONABLE ATTORNEY'S FEES.
 ¶ 36. Debbie argues that it was manifest error for the chancellor not to order Bard to pay all of her reasonable attorney's fees. On cross-appeal, Bard contends that it was manifest error for the court to order him to pay any of Debbie's attorney's fees. We find no error in the chancellor's determination as to attorney's fees and reject the appeal and cross-appeal on this issue. "Though the general rule in Mississippi is that if a party is financially able to pay his attorney's fees he should do so, this is a matter which is entrusted to the chancellor's sound discretion." Hensarling,824 So.2d at 592 (¶ 26), quoting Pittman v. Pittman,652 So.2d 1105, 1112 (Miss. 1995). The chancellor found that Debbie does not have the ability to pay substantial attorney's fees and "that it would be inequitable to require Debbie to pay the entire amount of her attorney fees." The chancellor found Debbie's attorney's fees to be reasonable and ordered Bard to pay one-half, or $18,709.95, of Debbie's attorney fees. Bard argues that the court found that some $25,000 in attorney's fees had been paid by Debbie through a loan from her parents, but that the finding was erroneous and the money was a gift to Debbie, not a loan. We have no evidence before us to substantiate his claim. This Court cannot find the chancellor abused his discretion in awarding Debbie one-half and only one-half of these expenses; he thoroughly considered Debbie's financial situation in making the award. *Page 848 
 ¶ 37. THE JUDGMENT OF THE MADISON COUNTY CHANCERY COURT ISREVERSED AND REMANDED AS TO THE CLASSIFICATION OF THE SCUDDERINVESTMENT ACCOUNT; ALL OTHER ISSUES ON DIRECT APPEAL ANDCROSS-APPEAL ARE AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSEDTO THE APPELLANT AND APPELLEE EQUALLY.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, CHANDLER, GRIFFIS AND ISHEE, JJ., CONCUR.
[1] The letter, dated June 7, 2001, from Kyra Zepernick, an analyst for Fed Corporation's retirement and saving plans, evidenced that as of October 31, 1989, Bard owned 250.448 shares of Roadway Services common stock, 67.739 units of Merrill Lynch corporate bonds, and 1,198.8 units of Merrill Lynch ready assets trust. Bard identified the handwritten notes as to values as being his own. The chancellor used the values of the stock as of October 31, 1989, in determining the non-marital portion of the IRA account. There is a $165 discrepancy between Bard's testimony and the computations of the court pursuant to the letter. This discrepancy is the result of Bard's using the lowest price for the Roadway Services common stock as of October 31, 1989, for his calculation and the chancellor's using the average between the low and high prices.
[2] While it is uncertain whether Bard's mother would have been applying for benefits in Mississippi or Ohio, we note that, depending on the state plan, an applicant for certain Medicaid benefits may be required to disclose all transfers of assets for less than market value which occurred within a thirty-six month "look back" period; if such transfer was made, the applicant may be ineligible for benefits for a period of time. See42 U.S.C. § 1396p(c) (Supp. 1993).
[3] The parties agreed that their marital home was valued at $125,000. The home was subject to a mortgage with a remaining balance due of $76,396.05. As a result, the chancellor correctly calculated that their equity in the marital home was $48,603.95. In the division of assets, the chancellor properly considered the value or equity in the home and tied ownership of the home to the payment of the corresponding mortgage.
[4] The chancellor found that Debbie's reasonable monthly needs were $3,230.58. With a current gross income of $700 per month, Debbie had a deficit of $2,530 per month. The chancellor found that based on the age of the children, and the need for childcare, Debbie should be awarded rehabilitative alimony of $400 per month for approximately four years. The chancellor then considered the standard of living to which both spouses had become accustomed. The chancellor noted that Bard would best be able to maintain this lifestyle but would "soon be burdened with the additional expenses of child support, the children's health insurance, and rehabilitative and periodic alimony," and that these expenses would reduce Bard's standard of living as well. Since there was no proof that Debbie's reentry into the workforce would allow her the standard of living to which she had grown accustomed, the chancellor awarded Debbie permanent, periodic alimony of $600 per month. The chancellor also noted that Debbie's vehicle's lease would soon expire, and that she would have the option to purchase the vehicle for $20,000. Based on this and considering Bard's separate estate, including his expense account, the chancellor awarded Debbie $5,000 in lump sum alimony.
[5] Debbie contends the chancellor erred in considering this amount to be Bard's monthly net income. We find substantial evidence to support the chancellor's determination. Bard testified that his prior income, upon which the $94,656 gross income for 2002 was based, had been reduced due to the loss of certain clients and that the decrease was expected to continue.
[6] The expense account was paid to Bard monthly as a percentage of the prior month's gross profits. While his employer encouraged Bard to use the payments for business expenses, he was not required to do so. The payments were reported as income to Bard on Form 1099 and, to the extent not used for business expenses, were taxable as ordinary income.
[7] After reviewing the record, we are unable to verify the $1,073 figure. Debbie's latest Rule 8.05 statement in the record lists the children's monthly expenses at $947.56 and is dated July 29, 2002. The testimony reflects that there was also a December 31, 2002 statement from Debbie to which the chancellor referred during trial; for some reason, this statement was not made part of the record. The chancellor did not mention exact figures for the children's reasonable expenses in his opinion or judgment. Therefore, the only figure we have to consider for the children's monthly expenses is $947.56.
[8] Debbie's contention that the court improperly used Bard's "net pay" instead of adjusted gross income is without merit.See, e.g., Kilgore, 741 So.2d at 354 (¶ 9) (holding "the statute uses the phrase `adjusted gross income,' and we find no error in the chancellor using the short-hand adjective `net.'")