ISHEE, J, for the Court.
 

 ¶ 1. On June 19, 2007, Sandra Melissa Hults (Melissa) and James Alan Hults (Alan) were granted a divorce on the ground of irreconcilable differences in the Chancery Court of Jackson County. In its judgment, the chancery court divided the parties’ marital property and granted Alan standard visitation to see his two minor children. The chancery court also ordered Alan to pay alimony in the amount of $900 per month and child support in the amount of $1,000 per month. The chancery court refused to award attorney’s fees to either party.
 

 ¶ 2. Aggrieved by the chancellor’s judgment, Melissa now appeals. She argues that: (1) the chancery court erred in deviating from the statutory child support guidelines; (2) the alimony award was insufficient; (3) the division of the marital assets was not equitable; and (4) it was error to refuse to award her attorney’s fees. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 3. Melissa and Alan were married on July 26, 1986, and they remained together until Alan left the marital home on July 3, 2006. The couple had two minor children, both boys, who were seventeen and eleven at the time of trial. Alan worked as a
 
 *1276
 
 fireman for Chevron, and on the side, he operated a commercial fishing business.
 

 ¶4. After
 
 moving out of
 
 the marital home, Alan filed for divorce citing adultery, cruel and inhuman treatment, or, in the alternative, irreconcilable differences as grounds. Melissa filed a counterclaim citing the same grounds for divorce. On September 29, 2006, the chancery court entered a temporary order in the case. The order awarded temporary physical custody of the children to Melissa, and it ordered Alan to pay $900 per month in temporary child support. The order also required Alan to pay $1,000 per month in temporary alimony and to pay the house note on the marital home, which was $1,013.29 per month. Under the temporary order, Alan had to pay insurance on all of the automobiles and maintain health insurance for the children.
 

 ¶ 5. Ultimately, the parties withdrew their fault-based grounds for divorce, and they agreed to a divorce on the ground of irreconcilable differences. The parties asked the chancellor to resolve the following issues: custody, child support, health care, life insurance, visitation, division of the marital assets, alimony, and attorney's fees.
 
 [1]
 

 ¶ 6. At the trial on the remaining issues, both parties testified about then* valuation of the various marital property and about their respective incomes. Finding that it was not reasonable to apply the child support guidelines, the chancellor ordered Alan to pay $1,000 per month in child support, to maintain health insurance on the children, to pay one-half of the children’s medical costs not covered by insurance, and to maintain life insurance of $150,000 for the benefit of the children.
 

 ¶ 7. Next, the chancellor divided the marital property. Four boats were included in the marital property: an eighteen-foot white Ranger boat valued at $35,000 by Melissa and $10,000 by Alan, a seventeen-foot red Ranger boat valued at $23,000 by Melissa and $5,000 by Alan, and two fifteen-foot aluminum skiffs valued at $3,500 each. The chancellor found that one skiff was for the use and benefit of the oldest son, and the other three boats were awarded to Alan. Alan had also won a boat at a fishing tournament after the separation, but the chancellor did not include it in the marital property.
 

 ¶ 8. There were five vehicles at issue: a 2006 Toyota Sequoia valued at $35,500 by Melissa and $44,000 by Alan, a 2005 Toyota Tundra valued at $12,000 by Melissa and $26,000 by Alan, a 1995 Toyota Avalon valued at $4,000 by Melissa and $1,000 by Alan, a 1995 Ford F-150 valued at $1,000 by Alan, and a 2002 Toyota Echo valued at $6,000 by Melissa. There was no outstanding loan balance on any of the vehicles.
 

 ¶ 9. The chancellor found the Toyota Echo to be a gift by the parties to Alan’s mother and was not considered as part of the marital estate. The chancellor then valued the Toyota Sequoia at $35,500 and awarded it to Melissa. The Toyota Tundra was valued at $12,000 and awarded it to Alan along with the Ford F-150 valued at $1,000. The chancellor found the Toyota Avalon to be for the use and benefit of the oldest son.
 

 ¶ 10. As for the marital home, the parties agreed to its appraised value of $184,000, with outstanding debt of $32,851.40. The chancellor awarded the
 
 *1277
 
 home to Melissa and ordered Alan to be responsible for the outstanding debt.
 

 ¶ 11. The vested balance of Alan’s Chevron Employee Savings Investment Plan was $517,404.84. The chancellor divided the retirement plan, awarding $115,000 to Melissa and $402,404.84 to Alan.
 

 ¶ 12. The chancellor valued various furniture in the marital home at $45,000 and awarded it to Melissa. The chancellor also accepted Melissa’s valuation of $12,700 for various electronics items and jewelry and awarded those items to Melissa. Melissa also received the lawn mower and weed eater, which the chancellor valued at $675.
 

 ¶ 13. Next, the chancellor divided the parties’ marital accounts. Melissa received the $2,552.70 in her savings account and the $18,985.34 in the parties’ mutual fund. The chancellor awarded Alan the $744 in his checking account and the $4,597 in his savings account. The chancellor found two mutual funds to be for the use and benefit of the children: a science and technology fund valued at $13,416.60 for the use and benefit of the oldest child, and a media and telecommunications fund valued at $21,081.78 for the use and benefit of the youngest child.
 

 ¶ 14. Besides the debt on the marital home, the only debts that the parties had at the time of trial were a $10,000 balance on Melissa’s VISA and a $100 balance at Kirkland’s. The chancellor found that Melissa incurred these debts after the separation and ordered her to pay them.
 

 ¶ 15. The last item of marital property that the chancellor divided was Alan’s interest in the Chevron Retirement Defined Benefit Plan (RDBP). The chancellor awarded Melissa one-half of a fractional interest in the plan, which was essentially the value of the plan accumulated during the marriage.
 
 [2]
 

 ¶ 16. After dividing the marital property, the chancellor noted that the parties were each awarded property of approximately equal value: $414,413.04 to Melissa and $408,894.44 to Alan. Further, the chancellor found that Alan’s earning capacity was substantially higher and awarded Melissa rehabilitative alimony of $750 per month for five years. In response to Melissa’s motion for reconsideration, the chancellor later increased the rehabilitative alimony to $900 per month. Last, the chancellor found that both parties were awarded sufficient assets and, therefore, refused both parties’ motions for attorney’s fees. Melissa timely filed the present appeal from the chancellor’s final judgment.
 

 STANDARD OF REVIEW
 

 ¶ 17. This Court’s standard of review in a domestic relations case is limited by the substantial evidence/manifest error rule.
 
 R.K. v. J.K.,
 
 946 So.2d 764, 772(¶ 17) (Miss.2007) (citing
 
 Mizell v. Mizell,
 
 708 So.2d 55, 59(¶12) (Miss.1998)). We will not reverse a chancellor’s judgment “unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied.”
 
 Id.
 
 (citing
 
 Mizell,
 
 708 So.2d at 59(¶ 13)). “Particularly in the areas of divorce and child support, this Court must respect a chancellor’s findings of fact which are supported by credible evidence and not manifestly wrong.”
 
 Id.
 

 
 *1278
 
 DISCUSSION
 

 I. Whether the chancellor’s child custody award was insufficient based on the statutory child support guidelines and, therefore, requires reversal.
 

 ¶ 18. Melissa first takes issue with the chancellor’s ruling that required Alan to pay her $1,000 per month in child support for the parties’ two minor children.
 

 ¶ 19. Mississippi Code Annotated section 43-19-101(1) (Rev.2004) sets forth guidelines that serve as a rebuttable presumption of the proper amount of child support that should be awarded. According to the guidelines, in cases involving two children, twenty percent of the parent’s adjusted gross income should be awarded.
 
 Id.
 
 Section 43-19-101(4) further provides, in part, that if the parent’s adjusted gross income is more than $50,000, the chancellor must make a written finding in the record as to whether the application of the guideline amount of child support is reasonable. Miss.Code Ann. § 43-19-101(4) (Rev.2004).
 

 ¶ 20. In making the child support award, the chancellor noted that Alan’s adjusted gross income was more than $50,000. After considering Alan’s income and the relevant facts of the case, the chancellor determined that, the application of the guidelines was not appropriate and reasonable. The chancellor reviewed Alan’s income for the years prior to 2007 and his reported income for 2007 and found his reported gross monthly income of $5,284.22 to be understated. Extrapolated, this figure would give Alan a yearly gross income of $63,410.64 for 2007 — without including overtime.
 

 ¶ 21. According to Alan’s income statement, which he filled out in September 2006, his adjusted gross income, with the statutory deductions for state and federal taxes and Social Security was $4,555.01 per month or 54,660.12 per year.
 
 [3]
 
 We see no evidence that the chancellor subtracted a figure for mandatory retirement, which Alan calculated to be $1,317.60 per month. Alan did not report any overtime income on his income statement, this despite the fact that his 2006 taxes reflected that his gross income was actually $113,066.
 

 ¶ 22. In addition to regular bi-weekly pay of $2,532,
 
 [4]
 
 the three pay stubs in the record reflect bi-weekly overtime payments from mid-April through the end of June in the amounts of $1,092.04; $2,231.56; and $1,305.70. At the end of June, Alan had a taxable base income of $54,189.60 for federal and state withholding purposes and a taxable base income of $56,106.76 for Social Security and Medicare purposes. The pay stubs reflect federal taxes of $9,409.79 and state taxes of $2,285. Social Security contributions totaled $3,478.62. Deducting these amounts from Alan’s taxable base would yield gross income of $40,933.35 for the first twenty-one weeks of 2007 — $1,949.21 per week. Multiplying this figure by fifty-two weeks gives a projected statutory adjusted gross income of $101,358.92. This figure assumes Alan continued to receive overtime pay at the same rate, and it does not take into account any mandatory retirement, which section 43 — 19—101(3)(b)(iii) requires to be deducted from the gross income.
 

 
 *1279
 
 ¶ 23. Alan testified that his overtime pay was mostly the result of work following Hurricane Katrina and that he would not be receiving as much extra pay as that work ended. This is supported by his tax records for the years preceding trial. From 2002 through 2006, Alan reported the following gross income on his tax records: $113,066 in 2006, with losses of $14,997; $123,538 in 2005, with losses of $12,678; $98,365 in 2004, with losses of $9,389; and $98,367 in 2003, with losses of $10,761. As Alan testified, his increase in income coincided with Hurricane Katrina, and his income fell the following year.
 

 ¶ 24. Finding that it was difficult to predict the amount of Alan’s adjusted gross income for 2007, the chancellor ordered Alan to pay $1,000 per month in child support. Under section 43-19-101(1), it is a rebuttable presumption that twenty percent of the non-custodial’s income is the proper amount of child support. Payments of $1,000 per month in child support would translate to $12,000 per year, which is twenty percent of $60,000. Therefore, $1,000 per month is presumed to be the appropriate statutory amount of support to award for two children when the non-custodial parent has an adjusted gross income of $60,000 per year.
 

 ¶ 25. In addition to the monthly child support award, the chancellor ordered Alan to maintain health insurance for the children. Health expenses are not considered in an award of child support, and it may be proper to consider it as a factor in awarding less than the guidelines suggest.
 
 Barnett v. Barnett,
 
 908 So.2d 833, 846(¶ 32) (Miss.Ct.App.2005) (quoting
 
 Kilgore v. Fuller,
 
 741 So.2d 351, 356(¶ 16) (Miss.Ct.App.1999)). Also, the chancellor found that two mutual funds were for the children’s use and benefit — the $13,416.60 fund to the oldest and the $21,081.78 fund to the youngest. Additionally, Alan had to maintain a life insurance policy in the amount of $150,000 for the benefit of the children, which he could reduce to $75,000 at the time the oldest child reached the age of twenty-one.
 

 ¶26. In addressing a chancellor’s deviation from the child support guidelines, this Court stated that the guidelines serve as guidance and are not to be followed “mechanically.”
 
 Kilgore,
 
 741 So.2d at 354(¶ 10). Nevertheless, this Court recognized that “it is important for the guidelines to shape a decision, as they allow the needs of a child and the financial ability of a parent to be blended.”
 
 Id.
 
 Ultimately, “the support that is required is to be determined by a chancellor ‘at a time real, on a scene certain, and with a knowledge special to the actual circumstances and to the individual child or children.’ ”
 
 Id.
 
 at (¶ 11) (quoting
 
 Smith v. Smith,
 
 614 So.2d 394, 397 (Miss.1993)).
 

 ¶ 27. In the case at bar, the chancellor considered the guidelines and rejected them as being unreasonable. Furthermore, the chancellor concluded that Alan’s income was difficult to predict in light of his uncertain overtime pay. We cannot disagree with the chancellor’s conclusion. In addition to the monthly child support payment, Alan was responsible for the children’s health insurance, and he maintained life insurance for their benefit. The children each received sums in the form of mutual funds, which were not factored into either party’s marital award. While the child support payments were somewhat less than the amount provided for in the guidelines, the chancellor stated that his award would deviate from the guidelines. When taken with the other support awarded to the children, we find that the children were adequately provided for and that the chancellor was within his discretion in finding that the guidelines did not apply and ordering child support payments
 
 *1280
 
 of $1,000 per month. This issue is without merit.
 

 II. Whether the chancellor erred in denying periodic alimony.
 

 ¶ 28. Next, Melissa argues that the chancellor was in error in denying her periodic alimony and awarding her only five years of rehabilitative alimony. To support an award of periodic alimony, Melissa points to the disparity in the parties’ incomes, the length of the marriage, her prior standard of living, and the fact that it was Alan who ended the marriage.
 

 ¶ 29. In
 
 Armstrong v. Armstrong,
 
 618 So.2d 1278, 1280 (Miss.1993), the supreme court set forth factors that a chancellor is to consider when awarding alimony. Those factors are as follows:
 

 1. The income and expenses of the parties;
 

 2. The health and earning capacities of the parties;
 

 3. The needs of each party;
 

 4. The obligations and assets of each party;
 

 5. The length of the marriage;
 

 6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;
 

 7. The age of the parties;
 

 8. The standard of living of the parties, both during the marriage and at the time of the support determination;
 

 9. The tax consequences of the spousal support order;
 

 10. Fault or misconduct;
 

 11. Wasteful dissipation of assets by either party; or
 

 12. Any other factor deemed by the court to be “just and equitable” in connection with the setting of spousal support.
 

 Id.
 

 ¶ 30. The supreme court has noted that rehabilitative alimony is not meant to equalize a difference in income between parties, “but instead, is to [allow] the party with lesser financial ability to start anew without being destitute in the interim.”
 
 Holley v. Holley,
 
 892 So.2d 183, 186(¶ 11) (Miss.2004). “Rehabilitative alimony is awarded to parties who have put their career on hold while taking care of the marital home. Rehabilitative alimony allows the party to get back into the working world in order to become self-sufficient.”
 
 Id.
 
 (quoting
 
 Lauro v. Lauro,
 
 847 So.2d 843, 849(¶ 15) (Miss.2003)).
 

 ¶ 31. In the case at bar, Melissa was awarded approximately fifty percent of the marital assets and was entirely debt free except for a $10,000 VISA credit card bill and a $100 Kirkland’s account that she accumulated following the parties’ separation. She did not have a car note, and Alan was responsible for paying the remaining debt on the marital home. Melissa was not working at the time of trial, but she listed monthly disability and unemployment insurance payments of $744. Melissa had high blood pressure, but she was only forty years old and was otherwise in good health and capable of working. She had an associate’s degree in marketing management, and she had prior work experience.
 

 ¶ 32. In light of the
 
 Armstrong
 
 factors, the chancellor awarded Melissa $900 per month in rehabilitative alimony for five years.
 
 [5]
 
 The chancellor noted that Melissa planned to return to school to finish a bachelor’s degree, and she expected to earn the degree in two or three years.
 

 
 *1281
 
 ¶ 33. With regard to alimony, the supreme court has said that “[i]f there are sufficient marital assets which, when equitably divided and considered with each spouse’s nonmarital assets, will adequately provide for both parties, no more need be done.”
 
 Johnson v. Johnson,
 
 650 So.2d 1281, 1287 (Miss.1994). In the present ease, the chancellor awarded each of the parties more than $400,000 in marital assets and found that the parties were adequately provided for. The chancellor’s award of rehabilitative alimony was not to lessen a deficit in the division of marital property- — the awards were roughly equal, with Melissa receiving slightly more. The rehabilitative alimony award was to provide for Melissa while she made the transition back to working outside the home.
 

 ¶ 34. When the alimony is combined with the payments on the marital home and the child support, the chancellor ordered Alan to pay Melissa almost $3,000 per month. Melissa was not working at the time of trial, but she was healthy and had the capacity to earn income. Ultimately, we find that it was within the chancellor’s discretion to award rehabilitative alimony. We also find no abuse of discretion or manifest error with the chancellor’s finding that the division of marital assets adequately provided for both parties and that there was no need to grant periodic alimony. This issue is without merit.
 

 III. Whether the chancellor’s division of marital property was inequitable.
 

 ¶ 35. Melissa next takes issue with the chancellor’s division of the marital assets. Specifically, she finds error with the following: (1) the valuation and award of the boats and vehicles, (2) the finding that Melissa’s VISA and Kirkland’s credit card debt was non-marital, and (3) the fact that the chancellor ignored Alan’s expenditures on his girlfriend, Sandy Vecchio.
 

 ¶ 36. In
 
 Ferguson v. Ferguson,
 
 639 So.2d 921, 928 (Miss.1994), the supreme court set out factors that a chancellor should consider when attempting to equitably divide marital property. Paraphrased, those factors are: (1) contribution to the accumulation of property, (2) dissipation of assets, (3) the market or emotional value of assets subject to distribution, (4) the value of assets not subject to distribution, (5) the tax and economic consequences of the distribution, (6) the extent to which property division may eliminate the need for alimony, (7) the financial security needs of the parties, and (8) any other factor that in equity should be considered.
 
 Id.
 

 ¶ 37. Based upon the chancellor’s valuation of the marital assets, Melissa was awarded $414,413.04. Alan was awarded $441,745.84, but the chancellor ordered him to pay the entire $32,851.40 debt on the marital home, which left him with marital assets of $408,894.44. The chancellor also found that Melissa was responsible for the $10,000 credit card debt that she had incurred since entry of the temporary order, after finding the debt to be non-marital.
 

 ¶ 38. Any property acquired or debt incurred after the entry of a temporary support order may be classified as separate property.
 
 Barnett,
 
 908 So.2d at 841(¶ 17) (citing
 
 Pittman v. Pittman,
 
 791 So.2d 857, 864 (¶¶ 17-18) (Miss.Ct.App.2001)). The chancellor found that Melissa’s debts were incurred after the entry of the temporary support order, and this finding is supported by the evidence. All testimony indicated that the credit cards were entirely paid off when the parties separated, and the only marital debt that existed was the debt on the marital home. The nineteen-foot Ranger boat that Melis
 
 *1282
 
 sa mentions was also won by Alan after entry of the temporary support order, and Alan had yet to claim the prize at the time of trial. Accordingly, we do not find any error or abuse of discretion in the chancellor’s classification of the credit card debt or the recently-won boat.
 

 ¶ 39. We similarly find no error or abuse of discretion with respect to the chancellor’s valuation of the vehicles and the remaining boats. Melissa takes issue with the chancellor’s valuation of the Toyota Tundra at $12,000, this despite the fact that $12,000 was the value that Melissa attributed to the vehicle in her financial declaration. Despite Melissa’s complaints about the chancellor’s valuations, she presents no evidence that the values placed on the vehicles or the boats were erroneous. The chancellor appears to have considered both parties’ valuations and accepted some of both. For example, the chancellor accepted Alan’s valuation of the eighteen-foot Ranger boat; however, the chancellor accepted Melissa’s valuations of the Toyota Tundra and Sequoia. In some cases, the chancellor split the difference in the parties’ valuations. Regarding the chancellor’s valuation of the marital property, we find no evidence indicating that the assigned values were the result of error or abuse of discretion on the chancellor’s part.
 

 ¶ 40. The last issue that Melissa specifically mentions with regard to the division of marital assets is the failure of the chancellor to offset Alan’s award by the alleged dissipation of assets on his girlfriend, Vecchio. We can find no evidence, as Melissa states, of the “many thousands of dollars spent by Alan on his ghdfriendAover.” Alan testified that he would sometimes take Vecchio along on out-of-town fishing tournament trips, but they were trips he would have taken whether or not she had accompanied him. Alan admitted that he bought Vecchio jewelry, but there was neither any testimony as to its worth nor any testimony that it was worth “many thousands of dollars.” Last, Alan spent $10,000 on a down payment on a lot and on construction of a bulkhead on that lot. Vecchio paid half, and they planned to build a house in which they would live once they were married. Melissa was awarded the marital home, and since moving out, Alan had been living with his parents. At some point Alan would have had to buy or build a new home. Accordingly, we do not agree with Melissa that the chancellor should have considered these expenditures to be a dissipation of marital assets. Furthermore, Alan testified that the funds he used to pay for the lot and the bulkhead came from funds he acquired after entry of the temporary support order, and Melissa offered no evidence to the contrary.
 

 ¶ 41. Ultimately, we do not find that the chancellor was in error or abused his discretion in equitably dividing the parties’ marital property. The awards were almost equal, and Melissa was well provided for in her award. We find that the decisions the chancellor made were within his discretion and were supported by the evidence. Therefore, this issue is without merit.
 

 IV. Whether it was error for the chancellor to refuse to award Melissa attorney’s fees.
 

 ¶ 42. The decision of whether to award attorney’s fees is generally left to the discretion of the chancellor.
 
 Lauro v. Lauro,
 
 924 So.2d 584, 591 (¶ 29) (Miss.Ct.App.2006) (citing
 
 Poole v. Poole,
 
 701 So.2d 813, 819 (¶ 26) (Miss.1997)).
 

 ¶ 43. The chancellor determined that the parties were awarded sufficient marital assets with which they could pay
 
 *1283
 
 their own attorney’s fees; therefore, he refused to award attorney’s fees to either party. We see no error or abuse of discretion with this ruling. This issue is without merit.
 

 ¶ 44. THE JUDGMENT OF THE CHANCERY COURT OF JACKSON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . The minor children initially took the stand and testified that they wished to live with their mother. The parties then withdrew their request to have the chancellor resolve the issue of child custody, and they agreed that Melissa would have primary physical custody of both children.
 

 [2]
 

 . The chancellor defined the fraction as "the numerator being the number of months from the date Mr. Hults began participating in the RDBP to the date of the Temporary Order ..and the denominator being Mr. Hults'[s] months of service upon his retirement or separation from employment.”
 

 [3]
 

 . Mississippi Code Annotated section 43-19-101 (3)(b) (Rev.2004) provides that the following must be deducted from a party's gross income: (1) federal, state, and local taxes, (2) Social Security contributions, and (3) mandatory retirement and disability contributions.
 

 [4]
 

 . This would extrapolate to a gross income of $65,832 per year or $5,486 per month for 2007 — a slight increase from Alan's reported gross income for 2006.
 

 [5]
 

 . The chancellor initially awarded Melissa $750 per month, but he increased the award to $900 per month after considering her motion for reconsideration.