ISHEE, J.,
 

 for the Court:
 

 ¶ 1. In 2007, Glen Picard filed for divorce from his wife, Paula Picard, in the Jackson County Chancery Court. A trial commenced in 2008, after which the chancellor issued a lengthy ruling of the court and entered a judgment of divorce. Two years later, Glen moved to alter or amend the judgment and alternatively requested a new trial. The chancellor denied Glen’s request, and Glen filed the instant appeal. Glen requests that the chancery court’s judgment be reversed as to the division of equity in the marital home, the alimony award, and the allocation of federal and state tax exemptions and tax refunds for the years 2005 through 2007. Finding no reversible error, we affirm.
 

 STATEMENT OF FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. Glen and Paula were married for fifteen years, during which time they had
 
 *342
 
 four daughters. Glen served on active duty with the United States military for approximately fifteen years while married to Paula. At the time Glen filed his complaint for divorce, he had been in service with the military for approximately twenty years. Glen had also worked in Louisiana for the New Orleans Police Department for approximately fourteen years.
 

 113. While serving in the military, Glen and his family were transferred to Keesler Air Force Base in Biloxi, Mississippi. The couple purchased a home in Ocean Springs, Mississippi, where they lived until Hurricane Katrina destroyed much of the Mississippi Gulf Coast in 2005. The couple’s marital home was severely damaged by Hurricane Katrina, and Glen agreed to remain in Ocean Springs while Paula and the children evacuated until the home was repaired enough for Paula and the children to live in it again. It was during this time that the couple claims their marriage became severely strained.
 

 ¶4. After the home was partially repaired, Paula and the children moved back home. At some point thereafter, Glen began a romantic affair with a woman named Tracey Fuette. Glen’s extramarital affair caused significant tension on the marriage, and Glen filed for divorce from Paula on February 16, 2007. Paula then filed an answer and counterclaim, which began a year-long contentious battle between the parties.
 

 ¶5. In February 2008, a two-day trial was conducted, after which the chancery court issued its findings and judgment. The couple’s divorce was granted on the basis of irreconcilable differences, and custody of the four children was given to Paula with Glen having substantial visitation rights. Glen and Paula’s financial condition was “a financial mess,” according to the chancellor. Specifically, in summarizing the parties’ financial distress, the chancellor analogized: “This [c]ourt is asked to cut off one end of a blanket and sew it to the opposite end and somehow make a longer blanket.” After reviewing the parties’ financial documents, the chancellor’s calculations showed Paula as having a loss of approximately $188.59 after her potential monthly income and debts were tallied. Glen was shown to be deficient approximately $1,053.60 after his monthly income and expenses were tallied.
 

 ¶ 6. The couple’s assets included the marital home, the equity of which totaled approximately $51,633.22 after repairs were made using Hurricane Katrina grant money. The chancellor ordered that final repairs be made to the home and that the home be sold upon the children reaching the age of majority. The home’s equity was to be distributed equally between the parties.
 

 ¶ 7. Despite Glen’s monthly debt, he was ordered to pay for COBRA health insurance for Paula for as long as the policy would allow and to pay $250 per month in alimony to Paula once the policy’s maximum time allowance was reached. The chancery court also ordered that Paula would receive the state and federal income tax dependent exemptions for two of the couple’s daughters and Glen would receive the exemptions for the parties’ other two daughters. Finally, the parties were ordered to equally divide their tax refunds for the years 2005 through 2007.
 

 ¶ 8. Aggrieved by the chancery court’s decision, Glen moved the court to reconsider. The chancery court denied Glen’s motion, from which he now appeals. On appeal, Glen claims the chancellor erred in the division of the equity in the marital home, allocation of alimony, and division of the tax exemptions and refunds. Finding no manifest error, we affirm.
 

 
 *343
 
 DISCUSSION
 

 I. Division of the Equity in the Marital Home
 

 ¶ 9. In domestic relations cases, we employ a limited standard of review.
 
 Carrow v. Carrow,
 
 741 So.2d 200, 202 (¶ 9) (Miss.1999). Specifically, “[w]e will not disturb the findings of a [c]hancellor unless the [c]haneellor was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.”
 
 Id.
 
 (citation omitted). With regard to division and distribution of property, we maintain the objective of “a fair division based upon the facts of the case[.]”
 
 Reddell v. Reddell,
 
 696 So.2d 287, 288 (Miss.1997) (citing
 
 Ferguson v. Ferguson,
 
 689 So.2d 921, 929 (Miss.1994)).
 

 ¶ 10. In general, when dividing and distributing property, courts employ the following factors, which were laid out in
 
 Ferguson v. Ferguson,
 
 689 So.2d 921, 928 (Miss.1994):
 

 (1) Substantial contribution to the accumulation of the property ...[;]
 

 (2) The degree to which each spouse has expended, withdrawn[,] or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decreet,] or otherwise[;]
 

 (3) The market value and the emotional value of the assets subject to distribution[;]
 

 (4) The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
 

 (5) Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
 

 (6) The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
 

 (7) The needs of the parties for financial security with due regard to the combination of assets, ineome[,] and earning capacity; and,
 

 (8) Any other factor which in equity should be considered.
 

 “In reviewing a chancellor’s judgment, [the appellate court] does not conduct a
 
 Ferguson
 
 analysis anew, but reviews the judgment to ensure that the chancellor followed the appropriate standards and did not abuse his discretion.”
 
 Phillips v. Phillips,
 
 904 So.2d 999, 1001 (¶ 8) (Miss.2004).
 

 ¶ 11. Glen’s first assignment of error challenges the distribution of equity and costs of the marital home. In analyzing his claim, we look to the chancery court’s ruling and order to determine whether an appropriate analysis was conducted by the chancellor. In the chancellor’s ruling, he reviewed the appraisal of the home and determined the home was valued at $127,000 in its then-current condition, without the completion of repairs needed after Hurricane Katrina. An analysis of the home’s mortgage debt resulted in the chancellor subtracting the property’s principal balance of $83,674.56, leaving a net equity of the home of $43,325.44.
 

 ¶ 12. Paula was awarded the remaining Hurricane Katrina grant money, which totaled $8,307.78. However, Paula was charged with using the funds only for repairs to the marital home and was ordered to provide proof to Glen that she had expended the grant money to repair the marital home. After doing so, the chancellor assigned the net equity in the home a value of $51,633.22. Upon the parties’ children reaching the age of majority, the
 
 *344
 
 chancery court ordered that the house should be sold and the profits equally divided between Glen and Paula. Furthermore, while Paula was granted possession of the home in which to reside with the four children, the chancellor ordered Glen and Paula to equally divide the home’s monthly mortgage payment, taxes, insurance, costs of reasonable repairs, and costs of general upkeep.
 

 ¶ 13. As such, the debt and equity of the home were divided fairly between Glen and Paula, with both sharing equally all monetary matters relating to the home. The only advantage Paula was given with regard to the marital home was the ability to live in the home. However, since Paula was granted custody of the four children, we do not find this advantage was an abuse of the chancellor’s discretion.
 

 ¶ 14. We have long held that Mississippi is an equitable-distribution state and that we look to the
 
 Ferguson
 
 factors to determine if property is divided equitably.
 
 Owen v. Owen,
 
 798 So.2d 894, 399 (¶ 14) (Miss.2001). The chancellor’s lengthy ruling included a review of the market value of the home both prior to the needed repairs and after the completion of the repairs, an analysis of the equity available to both parties, as well as the needs of both parties in relation to the home, including Paula’s custody of the four children. Having reviewed the chancellor’s extensive analysis, we determine the
 
 Ferguson
 
 factors were properly considered with regard to the marital home. This issue is merit-less.
 

 II. Alimony
 

 ¶ 15. Glen next asks us to review the chancellor’s allocation of alimony to Paula. The chancellor ordered that Glen pay the cost of COBRA health-insurance coverage for Paula up to the maximum amount of time allowed under the policy. Once the COBRA coverage expires, Glen must pay $250 a month in periodic alimony until Paula remarries, cohabitates, or begins receiving a portion of Glen’s military retirement, whichever occurs first.
 

 ¶ 16. In the chancellor’s ruling, he correctly acknowledged that an award of alimony is statutorily within the discretion of the trial judge under Mississippi Code Annotated section 93-5-23 (Rev.2009), which allows the trial court to “make all orders ... touching the maintenance and alimony of the wife or the husband, or any allowance to be made to her or him.” The chancellor specifically noted the following factors laid out in
 
 Brabham v. Brabham,
 
 226 Miss. 165, 176, 84 So.2d 147, 153 (1955), and later refined in
 
 Hemsley v. Hemsley,
 
 639 So.2d 909, 912-13 (Miss. 1994) with regard to alimony:
 

 (1) the health of the husband and his earning capacity;
 

 (2) the health of the wife and her earning capacity;
 

 (3) the entire sources of income of both parties;
 

 (4) the reasonable needs of the wife;
 

 (5) the reasonable needs of the children];
 

 (6) the necessary living expenses of the husband;
 

 (7) the estimated amount of income taxes the respective parties must pay on their incomes;
 

 (8) the fact that the wife has the free use of the home, furnishings[,] and automobile; and
 

 (9) such other facts and circumstances bearing on the subject that might be shown by the evidence.
 

 One year prior to
 
 Hemsley,
 
 the Mississippi Supreme Court enumerated the following factors in
 
 Armstrong v. Armstrong,
 
 618 So.2d 1278, 1280 (Miss.1993), which must
 
 *345
 
 be considered when reviewing cases involving spousal support:
 

 (1) The income and expenses of the parties;
 

 (2) The health and earning capacities of the parties;
 

 (3) The needs of each party;
 

 (4) The obligations and assets of each party;
 

 (5) The length of the marriage;
 

 (6) The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;
 

 (7) The age of the parties;
 

 (8) The standard of living of the parties, both during the marriage and at the time of the support determination;
 

 (9) The tax consequences of the spousal support order;
 

 (10) Fault or misconduct;
 

 (11) Wasteful dissipation of assets by either party; or,
 

 (12) Any other factor deemed by the court to be “just and equitable” in connection with the setting of spousal support.
 

 While the chancery court did not specifically list the
 
 Armstrong
 
 factors in its order, the court’s analysis nonetheless included consideration of each
 
 Armstrong
 
 factor, albeit in somewhat of an indirect fashion.
 

 ¶ 17. A thorough review of both parties’ financial conditions reveals that Paula’s net monthly pay totaled $2,321 and that her expenses, including the entire house note and other debts assigned to her, totaled $3,369.19. As such, Paula lacked approximately $1,048.19 per month in income to meet her expenses. However, her expenses were decreased by half the value of the house note since the chancellor ordered the note to be paid equally by Glen and Paula. Additionally, Paula testified she could increase her net monthly pay by approximately $268. As such, the chancellor determined Paula would lack approximately $188.59 per month to meet her necessary monthly expenses.
 

 ¶ 18. The chancellor then reviewed Glen’s financial condition. Glen’s net monthly income was $3,659, and his combined total expenses were $4,712.60, including his payment of one-half of the mortgage note. He lacked $1,053.60 per month to pay for his monthly expenses. However, the chancellor later noted Glen’s overstatement of his expenses by approximately $217.50. Nonetheless, both parties lacked sufficient funds to meet their monthly expenses. The chancellor noted their financial quandary, stating: “These parties are in a financial mess. Even without a divorce, which results in the necessity of two households, these parties are in financial disarray.”
 

 ¶ 19. The chancellor went on to acknowledge that Glen’s extramarital affair weighed heavily against him with regard to the marital fault of the parties. Directly before ordering Glen to pay periodic alimony, the chancery court stated: “It is without question that Mr. Picard’s income earning potential is higher than Ms. Pi-card’s. This is also a lengthy marriage and, in my opinion, this divorce is due to Mr. Picard’s fault or misconduct.” As such, it is evident the chancellor appropriately reviewed the applicable factors in granting Paula periodic alimony. We cannot find error in the chancellor’s alimony award. This issue is without merit.
 

 III. Division of Tax Exemptions and Tax Refunds
 

 ¶ 20. Glen next asserts the chancery court improperly divided the state and federal income tax dependent exemp
 
 *346
 
 tions for the children and the parties’ state and federal tax refunds. In his order, the chancellor assigned the state and federal income tax dependent exemptions for two of the children to Glen and the exemptions for the remaining two children to Paula. Additionally, Glen and Paula were ordered to agree to hire one accountant “to maximize the tax benefit of the Hurricane Katrina losses between the parties considering the separate income[s] of the parties.” Glen and Paula were then ordered to equally divide all tax refunds for the years 2005, 2006, and 2007.
 

 ¶21. The equal division of both the income tax dependent exemptions and the tax refunds reflects the chancellor’s attempt to divide the benefits fairly between the parties. The chancellor thoroughly analyzed the parties’ contributions during the marriage and the needs of the parties following the divorce in his ruling and order. The chancellor did not abuse his discretion in his analysis or his decision to split the exemptions and refunds equally. This issue is meritless.
 

 ¶ 22. THE JUDGMENT OF THE JACKSON COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ROBERTS, CARLTON, MAXWELL, RUSSELL AND FAIR, JJ., CONCUR.