# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-CA-00434-COA

**MICHAEL JACKSON**                                                              **APPELLANT**

**v.**

**ROSIE JACKSON**                                                                  **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/26/2013 |
| TRIAL JUDGE: | HON. TALMADGE D. LITTLEJOHN |
| COURT FROM WHICH APPEALED: | MONROE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | RICHARD SHANE MCLAUGHLIN |
| | NICOLE H. MCLAUGHLIN |
| ATTORNEY FOR APPELLEE: | LUANNE STARK THOMPSON |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | GRANTED DIVORCE TO APPELLEE ON THE GROUND OF HABITUAL CRUEL AND INHUMAN TREATMENT |
| DISPOSITION: | AFFIRMED - 11/04/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., ISHEE, ROBERTS AND CARLTON, JJ.**

**ISHEE, J., FOR THE COURT:**

¶1.     On May 20, 2009, Rosie Jackson filed for a divorce from her husband, Michael Jackson. Following a three-day trial, the Monroe County Chancery Court granted Rosie a divorce on the ground of habitual cruel and inhuman treatment. The chancery court also divided the marital estate and awarded lump-sum alimony to Rosie. Aggrieved, Michael appeals.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2.     Michael and Rosie married on December 26, 1976. Together, they had two children,

both of whom were emancipated by the time of these proceedings. Rosie filed for divorce on May 20, 2009, on the ground of habitual cruel and inhuman treatment. Michael answered her complaint, and later filed a motion in limine requesting the court to limit testimony regarding sexual allegations. At trial, the motion was overruled. A three-day trial was held on April 2, 2012, May 21, 2012, and August 21, 2012.

¶3.     From the date of their marriage until around 1986, Rosie made more money than Michael. Michael obtained his bachelor's degree in special education in 1975. He later obtained a master's degree in guidance education in 1977 and a master's degree in special education in 1979 or 1980. Michael worked several different part-time jobs in addition to teaching with the Aberdeen Public School System and later with the Okolona Public School System. While Michael continued his education, Rosie supported the family working full-time as a cosmetologist at Vasser's Beauty Shop, which is owned by her sister, Lillie Vasser. In 2008, Rosie began to work as a caregiver to the elderly in addition to working at Vasser's Beauty Shop seeing two to three clients a week. Due to health problems, Michael retired in 2010.

¶4.     In 1980, Michael and Rosie built a home located in Monroe County. Nearly a decade later, Rosie's sister, Marian Vasser, moved into the home with the Jacksons after she suffered a stroke that left her in need of assistance. The home was later modified to be handicap-accessible to accommodate Vasser's disabilities. Vasser contributed to the cost of the alterations and still resides with Rosie in the home today. The parties stipulated at trial that the marital home was worth $78,000. There was also evidence presented that a mortgage balance of $50,103 remained on the home, with $27,897 remaining in equity.

2

¶5.     The marriage between Rosie and Michael had deteriorated years prior to the divorce proceedings. Rosie claimed that they had not been together sexually since 1999, and that she had moved out of the marital bedroom in 2007. In 2008, Rosie received information involving sexual allegations about Michael.

¶6.     At trial, Rosie testified regarding a phone conversation she had with Michael's friend, John Doe.[1] She stated that, in February 2008, John called the Jacksons' home and told her, "Will you please tell your husband to leave me alone?" John testified at trial and was asked whether he had any kind of sexual relationship with Michael, to which he said no. Rosie also stated under oath that, in April 2008, she was approached by one of Michael's former students, James Doe, who informed her that Michael had sexually molested him twenty-six years earlier. James testified, in detail, that Michael molested him once when James was ten years old and was attending the same church as the Jacksons. Alma Jackson Flowers, the Jacksons' daughter, also testified that in 2008 she participated in a three-way phone conversation with Michael and another man, unbeknownst to Michael, where Michael solicited the man for oral sex.

¶7.     Both Rosie and Flowers stated that they confronted Michael about the sexual allegations, but he denied them. At trial, Michael denied all sexual allegations regarding homosexuality and child molestation. After confronting Michael, Rosie testified that the atmosphere in the home became very bad. She stated that Michael started coming home late, bringing men into the home, and cutting off the phone and electricity. Further, she claimed

---

[1]In the interest of confidentiality, we have chosen to change the names of some of the witnesses involved in the case.

that he intimidated her, bullied her, and talked cruelly to her.

¶8.     Rosie testified that she was traumatized by the information she learned about Michael. She stated that she began to experience problems with her blood sugar and blood pressure, could not sleep at night, and was prescribed Xanax to help with her anxiety.  As a result, Rosie moved out of the home on February 23, 2009.  Michael remained in the home until a temporary order was entered in September 2009 granting Rosie possession of the house.

¶9.     Following trial, the chancellor concluded that Rosie had proven habitual cruel and inhuman treatment by providing evidence of Michael's homosexual behavior, and the effect that this conduct had on Rosie's health.  The chancellor granted the divorce, divided the marital estate, and awarded Rosie lump-sum alimony.

¶10.    On appeal, Michael argues that the chancery court erroneously granted Rosie a divorce where: (1) the evidence was insufficient to support a divorce on the ground of habitual cruel and inhuman treatment, (2) the evidence relied upon by the chancellor was inadmissible, and (3) the equitable distribution and the alimony award were based on incorrect calculations.

¶11.    Additional facts, as necessary, will be related during our analysis and discussion of the issues.

## STANDARD OF REVIEW

¶12.    "This Court employs a limited standard of review when considering domestic-relations cases." *Jackson v. Jackson*, 114 So. 3d 768, 773 (¶10) (Miss. Ct. App. 2013) (citations omitted).  "Consequently, an appellate court will not disturb the chancery court's findings unless such findings are manifestly wrong [or] clearly erroneous, or the court

4

applied the wrong legal standard." *Id.* However, questions of law are reviewed de novo. *Gordon v. Gordon*, 126 So. 3d 922, 925 (¶9) (Miss. Ct. App. 2013) (citations omitted).

## DISCUSSION

### I.  Habitual Cruel and Inhuman Treatment

¶13.   "The chancellor's determination of whether a spouse's conduct rose to the level of cruel and inhuman treatment is a determination of law." *Jones v. Jones*, 43 So. 3d 465, 469 (¶7) (Miss. Ct. App. 2009) (citations omitted).  Mississippi Code Annotated section 93-5-1 (Rev. 2013) provides twelve fault-based grounds for divorce, including habitual cruel and inhuman treatment.  In order to establish a divorce on such ground, the offended spouse must show conduct that either:

> (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief or (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.

*Jones*, 43 So. 3d at 469 (¶9) (citations omitted).

¶14.   In reviewing whether the conduct reaches that of cruel and inhuman treatment, the chancellor must consider: "1) the conduct of the offending spouse and 2) the impact of that conduct upon the plaintiff."  *Fisher v. Fisher*, 771 So. 2d 364, 367 (¶10) (Miss. 2000) (internal quotations and citations omitted).  The evaluation of the impact of the conduct on the plaintiff is subjective. *Smith v. Smith*, 90 So. 3d 1259, 1263 (¶11) (Miss. Ct. App. 2011) (citing *Faries v. Faries*, 607 So. 2d 1204, 1209 (Miss. 1992)).  "The focus is on the effect the conduct has on the particular spouse, not its effect on an ordinary, reasonable person." *Id.*

¶15.   "The ground of habitual cruel and inhuman treatment may be established by a

5

preponderance of the evidence, rather than clear and convincing evidence, and the charge means something more than unkindness or rudeness or mere incompatibility or want of affection." *Fisher*, 771 So. 2d at 367 (¶9). The chancellor granted Rosie a divorce based on a finding that Michael's homosexual relations were such that they made the marriage revolting to Rosie. Therefore, we will focus on the second prong of the test for habitual cruelty – whether Michael's conduct was so unnatural and infamous as to make the marriage revolting to Rosie.

¶16. There has only been one case where the Mississippi Supreme Court has found that a homosexual affair, alone, constituted habitual cruel and inhuman treatment. *See Crutcher v. Crutcher*, 86 Miss. 231, 231, 38 So. 337, 337 (1905). In *Crutcher*, the supreme court found that "[u]nnatural practices of [pederasty] are an infamous indignity to the wife . . . which would make the marriage relation so revolting to her that it would become impossible for her to discharge the duties of wife." *Id.* Since *Crutcher*, this Court has found that evidence of homosexual affairs, *when combined with other misconduct*, can justify a divorce based on habitual cruel and inhuman treatment. *Morris v. Morris*, 783 So. 2d 681, 689 (¶¶27-28) (Miss. 2001).

¶17. The record here reflects it was not only alleged that Michael was involved in homosexual affairs, but that he had also molested a child. Rosie testified to learning about both allegations within rapid succession of one another. We find that the combination of this conduct was so repugnant to Rosie that it rendered her unable to perform her marital duties. However, it is well settled that a spouse's testimony regarding an offending spouse's behavior must be corroborated when habitual cruel and inhuman treatment is asserted. *Pace*

*v. Pace*, 16 So. 3d 734, 741 (¶31) (Miss. Ct. App. 2009) (citation omitted).

¶18. Rosie's testimony was supported by both Flowers and James. Flowers corroborated the allegations of a homosexual affair by testifying to the conversation she heard where Michael solicited sexual favors from another man. In support of the child-molestation allegations, James gave detailed testimony regarding the molestation that occurred at the hands of Michael when James was only ten years old. In addition to relying on this testimony, the chancery court also relied on other statements made by Rosie. However, we will address the other testimony in Michael's next issue. We find that Rosie's testimony, coupled with the corroborating testimony of both Flowers and James, was sufficient alone to support that Michael's conduct was cruel and inhuman.

¶19. Michael contends that, even if his conduct was found to be inhuman or cruel, Rosie failed to establish a causal connection between his conduct, the separation, and how it impacted her. We disagree. There is no longer a requirement that a specific act caused a separation but "[i]t is, instead, habitual or continuous behavior over a period of time, close in proximity to the separation, or continuing after a separation occurs, that may satisfy the grounds for divorce." *Fisher*, 771 So. 2d at 367-68 (¶10). Rosie testified that, upon learning of these sexual allegations, she began to experience adverse physical reactions to learning about Michael's sexual relationships and history. She also noted, once she confronted Michael, the atmosphere in the home changed and she gave examples of how Michael treated her.

¶20. Michael also asserts that, if his conduct were found to be true, Rosie condoned his behavior by remaining in the marital home for nearly a year after learning about the

7

homosexual affairs and child molestation. The chancellor noted, however, that Rosie had already left the marital bedroom in 2007 and had not engaged in sexual relations since 1999. Further, she was living with her disabled sister, Marian, in the marital home that had been specifically been renovated to accommodate Marian's disabilities. The chancellor also commented that Rosie may have been in financial duress since she had to take a second job to cover her expenses following the separation. In his final judgment, the chancellor acknowledged that there was no evidence presented by either party as to why Rosie waited to leave Michael. Nonetheless, the chancellor concluded that each of these factors played a role in his finding that Rosie had not condoned Michael's conduct.

¶21. The chancellor found that the evidence, Michael's conduct, and the impact it had on Rosie established a divorce on the ground of habitual cruel and inhuman treatment. Although Michael denied the allegations, and several witnesses testified on his behalf, the chancellor found Rosie's testimony to be credible. The supreme court has held that "[i]t is the role of the chancellor to ascertain whether witnesses and evidence are credible and the weight to give each." *Robinson v. Lanford*, 841 So. 2d 1119, 1122 (¶9) (Miss. 2003) (citing *Chamblee v. Chamblee*, 637 So. 2d 850, 860 (Miss. 1994)). For these reasons, we find Michael's overall conduct sufficient to support a divorce based on habitual cruelty.

**II.    Admission of Evidence**

¶22. Mississippi Rules of Evidence 801(c) provides that "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Unless the statement falls within an exception provided by law, hearsay is not admissible. M.R.E. 802. "The admission of testimonial

evidence is within the sound discretion of the trial court, which will be found in error only if the ruling was an abuse of discretion." *Bailey v. State*, 956 So. 2d 1016, 1025 (¶26) (Miss. Ct. App. 2007) (citing *Lynch v. State*, 877 So. 2d 1254, 1281 (¶86) (Miss. 2004)). "Any error in the admission or exclusion of evidence is not grounds for reversal unless the error adversely affected a substantial right of a party." *Id.*

¶23. Michael asserts that the chancery court erred when it admitted and relied on a myriad of inadmissible evidence in finding grounds for divorce in favor of Rosie. Specifically, Michael directs this Court's attention to the following: Rosie's testimony of out-of-court statements made by John to Rosie in a phone conversation; Flowers's testimony of out-of-court statements made by John; and James's testimony regarding the molestation that occurred when he was ten years old.

¶24. During trial, Rosie was questioned as to whether or not she learned more information that involved allegations about Michael and when she learned this information. Subsequently, the following dialogue ensued:

> A. February 9, 2008, that's when I came home from work one Saturday evening around 7:15. When I stepped in the door of my house, the telephone was ringing. Michael was sitting there on the edge of the couch. With me knowing Michael as a phonoholic, he was not answering the phone. Our phone — the first phone is in the kitchen on the wall. I didn't even get a chance to put my purse down. I went and answered that phone. When I answered that phone, this person told me —
>
> MR. BENNIE L. JONES, JR: I object to hearsay, Your Honor.
>
> CHANCELLOR TALMADGE D. LITTLEJOHN: Sustained unless it was Michael or unless it was done in his presence. Was Michael there hearing the phone conversation?

Q.    Could Michael hear the conversation, Rosie?

A.    I don't know whether he heard it. He was sitting there in the den and I was wondering why he wasn't answering the phone and I'm just walking in the door.

CHANCELLOR TALMADGE D. LITTLEJOHN: Overruled.

Q.    All right. Rosie, don't tell us what the person said on the phone, but you learned some more information on the phone about some activities that Michael was involved in; is that correct?

A.    Yes, I did.

CHANCELLOR TALMADGE D. LITTLEJOHN: I asked if he overheard the conversation. It's not hearsay. That's why I asked her and she said he was there.

MS. LUANNE S. THOMPSON: I'm Sorry. I misunderstood, Your Honor.

Q.    So, Rosie, who was on the phone?

MR. BENNIE L. JONES, JR.: Your Honor, if I may?

THE WITNESS: You want me to tell who was on the phone?

CHANCELLOR TALMADGE D. LITTLEJOHN: Just a minute. Yes sir.

MR. BENNIE L. JONES, JR.: She said she learned something, and that was my objection to hearsay.

CHANCELLOR TALMADGE D. LITTLEJOHN: I understand that part. But I'm saying if he was there and heard the conversation, that's not hearsay if your client was there.

MR. BENNIE L. JONES, JR.: Yes, sir.

CHANCELLOR TALMADGE D. LITTLEJOHN: She hasn't developed that yet.

MR. BENNIE L. JONES, JR.: But she said she didn't know

10

whether he heard her or not.

THE WITNESS: He was sitting on the edge of the couch in the den. He knew who it was calling. That's why he didn't answer the phone.

CHANCELLOR TALMADGE D. LITTLEJOHN: That's what she said.

THE WITNESS: And the person —

CHANCELLOR TALMADGE D. LITTLEJOHN: Just a minute, ma'am. Just a minute, please. The objection is overruled on that basis. Go ahead.

After a review of this testimony and the record, it is not clear whether Michael was actually privy to the phone conversation that Rosie had with John. While it may be true that he was in the room, Rosie was not certain that Michael heard any of the actual conversation. Michael's presence in the room alone does not negate the fact that, at trial, John's statements made to Rosie over the telephone were hearsay. We cannot say that these hearsay statements fall within any exception provided by law. Therefore, the chancellor erred in overruling Michael's objection. Nonetheless, the error was harmless, and as stated previously, there was sufficient evidence to support a divorce on the ground of habitual cruel and inhuman treatment without Rosie's testimony regarding John's out-of-court statements.

¶25. With regard to Flowers's testimony, Michael's attorney objected when she began to testify as to the out-of-court statements allegedly made to her by John. The chancery court then allowed the testimony as a proffer. Following the proffer, the chancery court overruled the motion and allowed Flowers's testimony to become a part of the record. However, in the final judgment, the chancellor revisited the issue and reversed the ruling made at trial,

11

thereby sustaining the objection to Flowers's statements as they pertained to the out-of-court statements allegedly made by John, and striking that testimony from the record. The chancellor declined to consider this particular line of testimony in the final judgment. Therefore, this assignment of error is moot.

¶26. Michael also asserts that James's testimony regarding an event that occurred twenty-six years earlier should have been excluded because it was irrelevant, held no probative value, and was stale evidence. Therefore, he argues that the chancery court erred in denying his motion in limine. We find no merit to this assignment of error.

¶27. "The standard of review regarding Rule 403 determinations is . . . abuse of discretion." *Fitch v. Valentine*, 959 So. 2d 1012, 1022 (¶23) (Miss. 2007). Although the testimony regarded an event that occurred twenty-six years earlier, it was relevant to the information Rosie learned in 2008 about Michael. Further, it concerned Michael's conduct during their marriage. In overruling Michael's motion in limine, the chancellor concluded that "[whether] the testimony of William Shaw is credible should be the issue rather than whether his testimony should be excluded." We find that the chancery court did not abuse its discretion in denying Michael's motion in limine. As such, this issue is without merit.

### III. Equitable Division and Alimony Award

¶28. In divorce cases, our review of a chancellor's division and distribution of property is limited. *Jenkins v. Jenkins*, 67 So. 3d 5, 8 (¶8) (Miss. Ct. App. 2011) (citations omitted). "A chancellor's division and distribution will be upheld if it is supported by substantial credible evidence. However, this Court will not hesitate to reverse if it finds the chancellor's decision is manifestly wrong, or that the court applied an erroneous legal standard." *Jenkins*, 67 So.

12

3d at 8-9 (¶8) (citations omitted).

¶29. The supreme court decision in *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994), provides the framework for property division and distribution. *Dickerson v. Dickerson*, 34 So. 3d 637, 643 (¶23) (Miss. Ct. App. 2010). "Chancellors are directed to (1) classify the parties' assets as marital or separate; (2) determine the value of those assets; (3) divide the marital estate equitably based upon the factors set forth in *Ferguson*; and (4) consider the appropriateness of alimony if either party is left with a deficiency." *Id*. (citations omitted). The *Ferguson* factors include:

(1) Substantial contribution to the accumulation of the property;

(2) The degree to which each spouse has expended, withdrawn, or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree, or otherwise;

(3) The market value and the emotional value of the assets subject to distribution;

(4) The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

(5) Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

(6) The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

(7) The needs of the parties for financial security with due regard to the combination of assets, income, and earning capacity; and,

(8) Any other factor which in equity should be considered.

*Picard v. Picard*, 85 So. 3d 340, 343 (¶10) (Miss. Ct. App. 2012). Further, "[c]hancellors

should also consider each party's marital fault." *Bond v. Bond*, 69 So. 3d 771, 773 (¶5)

(Miss. Ct. App. 2011) (citation omitted).

¶30.    Applying the *Ferguson* factors, the chancellor divided the marital assets and liabilities,

respectively, as follows:

Michael

Michael's PERS retirement account, with stipulated balance of **$118, 350.64**
John Hancock life insurance policy with cash value of **$500.00**
Michael's savings account, with balance of **$460.00**
Two (2) sofas from the den in the marital home, furniture in Alma's and Enos's bedrooms in the marital home, calculated at one-half of the total for furnishings ($1,500.00/2=$750.00), **$750.00**
2006 Ford F-150 pickup truck
1998 Chevy 1500 pickup truck
1997 Mercury Marquis
1992 Cadillac Seville, valued at **$250.00**
1990 Volvo
Two (2) horses and assorted equine equipment, including horse trailers and tack
All of Michael's personal property already in his possession
**Total: $120,310.64**

Rosie

Marital residence and the three (3) acres it sits on, with equity of $27,897.00
Additional three (3) acres of land that are adjacent to the marital home and property, with equity of $2,000.00
Rosie's checking ($206.00) and savings ($500.00) accounts, with total balance of **$706.00**
All remaining person property, including, but not limited to, one (1) computer ($300.00), two (2) televisions ($150.00), one (1) push-mower ($25.00), one (1) riding mower ($100.00), and all remaining household furnishings, valued at one-half of the total for furnishings ($1,500.00/2=$750.00), for total of **$1,325.00**
**Total: $31,928.00**

. . . .

Michael

Capital One debt, balance of **$950.00**
Shell Oil debt, balance of **$1,400.00**

14

Sears debt, balance of **$1,100.00**
Trustmark debt, balance of **$1,500.00**
**Total: $4,950.00**

<u>Rosie</u>
Mortgage debt on the marital home, balance of **$50,103.00**
**Total: $50,103.00**

Michael asserts that the chancellor erroneously counted the mortgage debt against Rosie's distribution twice – once by calculating the home's equity, and again by reducing the equity by the home's debt. Michael contends, therefore, that Rosie's distribution was undervalued by $50,103, and the chancellor erroneously concluded that Rosie's estate had a negative value of $18,175. Michael argues that, by appropriately calculating the mortgage debt only once, then Rosie's estate would be $31,928. We disagree.

¶31. "In reviewing a chancellor's judgment, the appellate court does not conduct a *Ferguson* analysis anew, but reviews the judgment to ensure that the chancellor followed the appropriate standards and did not abuse his discretion." *Id*. "Equitable distribution does not mean equal distribution." *Jenkins*, 67 So. 3d at 11 (¶13) (citations omitted). Michael was granted the majority of the marital assets, with Rosie receiving the majority of the marital liabilities. In assigning the assets and liabilities concerning the marital home, the chancellor stated, "Michael will no longer be financially responsible for payment of the mortgage, and will be under no other obligation, financial or otherwise, with regard to the marital home, after entry of this Final Judgment." It is clear that the chancery court's intent was for Michael to no longer have involvement in the marital home. Therefore, we find that the chancellor's findings are supported by credible evidence and are not manifestly wrong.

¶32. Following the equitable division of marital property, "if one party is left with a deficit,

15

alimony based on the value of non-marital assets should be considered." *Barnett v. Barnett*, 908 So. 2d 833, 843 (¶24) (Miss. Ct. App. 2005) (citations omitted). The amount of alimony, if awarded, should be reasonable and comparable to the "wife's accustomed standard of living, minus her own resources, and considering the ability of the husband to pay." *Id.* (citing *Gray v. Gray*, 562 So. 2d 79, 83 (Miss. 1990)). "As long as the chancellor follows this general standard, the amount of the award is largely within his discretion." *Id.*

¶33. Next, Michael argues that a correct calculation of the assets to each party would not justify any award of lump-sum alimony to Rosie. As stated previously, we find that the chancellor did not err in his calculation of the marital property. Following the equitable division, the chancery court found that Rosie would be left with a deficit. The chancellor then provided detailed findings pursuant to an analysis of the factors set forth in *Cheatham v. Cheatham*, 537 So. 2d 435, 438 (Miss. 1988). Therefore, we cannot find that the chancellor erred in awarding Rosie lump-sum alimony. The judgment of the chancery court is affirmed.

¶34. **THE JUDGMENT OF THE MONROE COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. BARNES AND FAIR, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**